Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC v. Brewer, 2009 NCBC 10.

STATE OF NORTH CAROLINA

COUNTY OF CUMBERLAND

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS 6091

MITCHELL, BREWER, RICHARDSON, )
ADAMS, BURGE & BOUGHMAN, )
PLLC; GLENN B. ADAMS; )
HAROLD L. BOUGHMAN; )
JR.; and VICKIE L. BURGE, )
           Plaintiffs )
)
       v. )         **OPINION AND ORDER**
)
COY E. BREWER, JR.; )
RONNIE A. MITCHELL; )
WILLIAM O. RICHARDSON; )
and CHARLES BRITTAIN, )
           Defendants )

[1]    This civil action arises out of the breakup of a law firm organized as a professional limited liability company ("PLLC"). It presents, among other things, the question of whether members of the PLLC, through words and actions, withdrew from the law firm or whether there was a dissolution of the firm pursuant to the North Carolina Limited Liability Company Act, N.C. Gen. Stat. § 57C-1-01 *et seq.* (the "Act") (respective Sections of the North Carolina General Statutes are cited herein as "G.S."). This question appears to be one of first impression in North Carolina, and is material to determining a member's distributional share after departure from the PLLC.

[2]    This matter comes before the court for hearing upon the respective parties' motions for summary judgment (the "Motion(s)") pursuant to Rule 56, North Carolina Rules of Civil Procedure ("Rule(s)"), and applicable provisions of the Act.

[3]    After considering the arguments; briefs; depositions and other discovery materials, all of which are deemed to be before the court for purposes of determining the Motions; submissions of counsel and other appropriate facts and matters of record, as discussed below, the court concludes that the Motions should be GRANTED in part and DENIED in part.

*Everett Gaskins Hancock & Stevens, LLP, by E.D. Gaskins, Jr., Esq. and Louis Wooten, Esq. for Plaintiffs Mitchell Brewer Richardson Adams Burge & Boughman, PLLC, Glenn B. Adams, Harold L. Boughman, Jr. and Vickie L. Burge.*

*Brooks Pierce McLendon Humphrey & Leonard, LLP, by Jim W. Phillips, Jr., Esq. and Charles F. Marshall, Esq. for Defendants Coy E. Brewer, Jr., Ronnie A. Mitchell, William O. Richardson and Charles Brittain.*

Jolly, Judge.

## I.

## PROCEDURAL BACKGROUND

[4]     This civil action was filed in Cumberland County Superior Court.  It was designated a complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to G.S. 7A-45.4(b), dated July 14, 2006; and was assigned to the undersigned Special Superior Court Judge for Complex Business Cases, by Order of the Chief Special Superior Court Judge for Complex Business Cases, dated July 25, 2006.

[5]     Plaintiffs filed their Amended Complaint ("Complaint") on August 2, 2006. The Complaint was amended again by Order dated May 21, 2007.  Defendants filed their Answer and Counterclaims ("Answer") on June 13, 2007.  Pursuant to a Revised Consent Order Modifying Case Management Order ("Revised CMO"), dated September 6, 2007, Plaintiffs and Defendants filed their respective Motions for Partial Summary Judgment on January 9, 2008.  On August 15, 2008, Defendants filed a second dispositive Motion, their Motion for Summary Judgment, by which they seek dismissal of all claims as to all Defendants (the court will refer to Defendants' Motion for Partial Summary Judgment filed on January 9, 2008, and Defendants' Motion for Summary Judgment filed on August 15, 2008, collectively in the singular as Defendants' "Motion").  Thereafter, the Complaint was amended again by Order dated February 13, 2009 (for purposes of the Motions all amendments are deemed incorporated into the Complaint).

II.

FACTS

[6]     The court CONCLUDES that the following material facts exist without substantial controversy and are pertinent to the issues raised by the Motions:[1]

[7]     Plaintiff Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC (the "Firm"), is a North Carolina PLLC[2] that maintains its principal place of business in Cumberland County, North Carolina.

[8]     Plaintiff Glenn B. Adams ("Adams") is an individual residing in Cumberland County, North Carolina.

[9]     Plaintiff Harold L. Boughman, Jr. ("Boughman") is an individual residing in Cumberland County, North Carolina.

[10]     Plaintiff Vickie L. Burge ("Burge") is an individual residing in Cumberland County, North Carolina.

[11]     Defendant Coy E. Brewer ("Brewer") is an individual residing in Cumberland County, North Carolina.

[12]     Defendant Ronnie A.[3] Mitchell ("Mitchell") is an individual residing in Cumberland County, North Carolina.

[13]     Defendant William O. Richardson ("Richardson") is an individual residing in Cumberland County, North Carolina.

[14]     Defendant Charles Brittain ("Brittain") is an individual residing in Cumberland County, North Carolina.

[15]     At times material, each of the individual Plaintiffs and Defendants was licensed to practice law in North Carolina, and they collectively comprised all the members[4] ("Member(s)") of the Firm.

---

[1] It is not proper for a trial court to make findings of fact in determining a Rule 56 motion.  However, it is appropriate for a Rule 56 order to reflect material facts that the court concludes exist and are not disputed, and which support the legal conclusion with regard to summary judgment.  *Hyde Ins. Agency v. Dixie Leasing*, 26 N.C. App. 138 (1975).

[2] Technically, the Firm is a PLLC.  However, the relevant statutes treat a PLLC and an LLC identically.  *See* G.S. 57C-2-01(c).  Accordingly, this Order at times refers to the Firm as an LLC.

[3] The Complaint uses the middle initial "A" for Defendant Mitchell.  Defendants' Answer and Counterclaims use the middle initial "M" for Defendant Mitchell.

[4] For purposes of the Motions, the court construes this to mean "members" as defined by G.S. 57C-1-03(14).

[16]     On June 14, 2005, the Firm's Members met to discuss the Firm's economic performance.  Brewer began by describing what he saw as a decline in the Firm's gross revenues in the individual Plaintiffs' practice areas, which consisted primarily, but not exclusively, of hourly billing transactional work.  At some time during the discussions that followed, Plaintiff Adams physically stood up and announced that he was leaving the firm.  Among others, his specific words were, "I am out of here."  When asked by Defendant Mitchell not to leave the meeting, Plaintiff Adams stated he was not just walking out of the meeting, but rather "[he] meant out of the firm."  Plaintiff Adams in fact left the meeting room.  Shortly after Adams left the room, the Plaintiff Boughman also announced that he "no longer wanted to be a part of this firm and that [he was] leaving."  He, too, left the meeting room.  During the next two weeks, both Adams and Boughman physically returned to work at the Firm while making preparations to form a new law firm.  On or about June 25, 2005, Plaintiff Burge informed Defendant Mitchell that she, too, was leaving the Firm and going to join Adams and Boughman in a new law practice.

[17]     On or about June 30, 2005, Plaintiffs Adams, Burge and Boughman ceased practicing law with Brewer, Mitchell, Richardson and Brittain (the Firm's "Breakup").

[18]     On June 14, 2005, Plaintiff Adams sent an e-mail message to Brewer and other members of the Firm.  The message concerned his share of revenue and compensation, and referred to his "leaving the firm."[5]

[19]     On or about July 7, 2005, the individual Plaintiffs executed articles of organization for a PLLC law firm entity by the name of Adams, Burge & Boughman ("AB&B").  On the same day, they signed an application for a certificate of registration for a PLLC that was submitted to the North Carolina State Bar.  They contemporaneously began the practice of law under the AB&B name.

[20]     Shortly after the Breakup, Plaintiff Burge prepared two forms of proposed letters to be sent to Firm clients.  One of the draft letters,[6] which was undated, stated that the individual Plaintiffs had "withdrawn" from the Firm as of June 30, 2005.  The

---

[5] Defs.' Notice Filing Ex. Supp. Mot. Partial Summ. J. ("Defs.' Ex."), Ex. H.
[6] Defs.' Ex. I.

other draft letter,[7] dated July 12, 2005, stated that the individual Plaintiffs were "terminating their employment" with the Firm. These letters were approved by Defendant Mitchell, but were not sent to clients.

[21]     The Firm initially was organized in October 2000. The Articles of Organization ("Articles") for the Firm do not contain any provisions dealing with issues of withdrawal or dissolution by or between the various Members. The Members never executed a written document formally designated as an operating agreement. Further, they never executed a written agreement specifically reflecting consent or agreement of the Members as to whether the Breakup was to constitute (a) withdrawal from the Firm by the individual Plaintiffs or (b) dissolution of the Firm.

[22]     Following the Breakup, the individual Plaintiffs practiced law together in the new law firm of AB&B. Some clients who had then-unresolved contingent fee engagements with the Firm continued such matters with the Firm (the "Contingent Fee Case(s)"). Other clients who had then-unresolved contingency fee engagements with the Firm retained AB&B to handle their cases.

[23]     In late June 2005, after the Breakup, Adams and Brewer met to discuss the individual Plaintiffs' interest in the Firm. Brewer was designated to speak on behalf of Defendants, and Adams was designated to speak on behalf of the individual Plaintiffs. They agreed that the individual Plaintiffs could remain in the Firm's offices until they secured new office space. They did not agree on the value of Plaintiffs' interest in the Firm.

[24]     Defendant Brewer subsequently undertook to perform an "accounting" of the Firm's financial status. In a July 8, 2005 memorandum to the Firm's Members (The "Brewer Memo"),[8] Brewer presented the results of this accounting. The Brewer Memo repeatedly references the Breakup as a "withdrawal" from the Firm by the individual Plaintiffs. It was captioned with the legend: "Re: Winding up of affairs; dissolution of partnership."

[25]     The Brewer Memo included a proposed allocation of existing debts and obligations of the Firm and a proposed final distribution to the Plaintiffs. Among other

---

[7] Defs.' Ex. J.
[8] Am. Compl., Ex. 1.

things, the Brewer Memo addressed payment of the Firm's lines of credit and other Firm obligations as of July 1, 2005, a cash distribution of $25,000 or more to each individual Plaintiff, and a proposal that Plaintiffs retain their then-current cases without remitting to the Firm any fees subsequently recovered in those cases. The Brewer Memo also proposed that the individual Plaintiffs would not receive any share of then-unresolved Contingent Fee Cases remaining with the Firm, on the theory that the individual Plaintiffs had withdrawn from the Firm as of July 1, 2005, and that the value of unresolved Contingent Fee Cases could not reasonably be ascertained as of that date. Checks reflecting the proposed cash distributions were cut and delivered to the individual Plaintiffs.

[26]    Thereafter, in August, 2005, Plaintiff Boughman contacted BB&T to determine that in fact the individual Plaintiffs' contingent liability for Firm debts and obligations, including personally-guaranteed lines of credit, had been paid by the Firm. Boughman further requested, and received from Defendants, a release of the individual Plaintiffs' present and future personal liabilities on Firm lines of credit and credit cards. At the time these actions were taken, the Defendants were not aware that the individual Plaintiffs disagreed with the financial proposals reflected in the Brewer Memo and that they did not intend to cash the distribution checks.

[27]    Other than the meeting in late June 2005 between Adams and Brewer, the only conversations that took place from late June 2005 to early 2006 between any of the individual Plaintiffs and any of the Defendants with regard to the Breakup concerned furniture issues. Those were resolved by agreement. During that time, the individual Plaintiffs did not voice any disagreement with the distributions proposed in the Brewer Memo. Although they did not cash the distribution checks, they did not inform the Defendants that they were refusing to do so.

[28]    It was not until January 2006, that the individual Plaintiffs, through their legal counsel, lodged their objection to the terms of the Brewer Memo and informed Defendants that they refused to cash the distribution checks. At that time, their primary expressed concern was how the Brewer Memo proposed valuation of the Contingent

Fee Cases.[9]  This was done by way of a letter[10] to Brewer, dated January 6, 2006, from counsel for the individual Plaintiffs, in which the Breakup was referred to as a "withdrawal" from the Firm by the individual Plaintiffs.  More specifically, the letter from Plaintiffs' counsel to Defendant Brewer states that "this firm represents . . . [Plaintiffs] in connection with their *withdrawal* from the PLLC with you, Ronnie Mitchell, and Billy Richardson" (emphasis added).  The letter goes on to say:

> In particular, we believe your assessment that the firm's contingent fee cases, no matter how lucrative their outcome, cannot be taken into consideration in determining the value of the *withdrawing attorneys*' interest and [sic] is not consistent with North Carolina law (emphasis added).

[29]    The January 6, 2006 letter clearly is drawn in the context of a disagreement on the value of and the methodology for valuing the Contingent Fee Cases, and does not on its face deny that Plaintiffs had withdrawn from the Firm.

[30]    In a subsequent letter to Brewer[11] some six months later, dated June 21, 2006, counsel for the Plaintiffs referred to the Breakup as a "dissolution."  In this letter, counsel for the individual Plaintiffs discusses the duties of managing Members of an LLC in winding up its affairs upon dissolution. The letter does not deal with the question of whether the Breakup constituted a "withdrawal" by the Plaintiffs.  Rather, it clearly reflects a contention that the individual Plaintiffs were Members of the Firm at the time of a "dissolution."

[31]    At times material, and for purposes of the Motions, the Firm has continued to operate as a going concern.  Articles of dissolution were not filed with the North Carolina Secretary of State, and Defendants did not organize a separate law firm entity. They continued to hold themselves out to the public as "Mitchell, Brewer, Richardson," and used the same logo for the Firm as was used prior to the Breakup.

[32]    For purposes of this Order, the undisputed facts reflected in paragraphs 7 through 31 sometimes will be referred to herein collectively, as the "Breakup Facts."

---

[9] In a prior ruling in this matter the court determined that an unresolved contingent fee case being handled by a PLLC law firm at the time of withdrawal by a member, or dissolution, constitutes a firm "asset" in which a member attorney has distributive rights, notwithstanding that the attorney performed no legal work on the case.  (Order, May 8, 2007.)  There has been no determination of the methodology or mechanics of valuing such an asset.

[10] Am. Compl., Ex. 2.

[11] *Id.*, Ex. 3.

[33]   Plaintiffs subsequently filed this civil action.  In their Complaint the Plaintiffs allege claims ("Claim(s)") individually and derivatively in behalf of the Firm for:

    (a)   An accounting to the Firm;

    (b)   An accounting to the individual Plaintiffs;

    (c)   A liquidating distribution by Defendants to the individual Plaintiffs under G.S. 57C-6-05;

    (d)   Damages for constructive fraud/breach of fiduciary duty;

    (e)   Damages for unfair and deceptive trade practices; and

    (f)   Injunctive relief to prevent Defendants from incurring debt or practicing law in the name of the Firm, except for its "winding up."

[34]   By way of their Answer, Defendants raise seventeen affirmative defenses. They further allege counterclaims ("Counterclaims") against the individual Plaintiffs for:

    (a)   Declaratory judgment to the effect that either (i) the individual Plaintiffs withdrew from the Firm or (ii) their rights to Firm distributions otherwise are limited to the value of their interests as of the date of the Breakup;

    (b)   Declaratory judgment to the effect that, under principles of equitable estoppel, by their actions the individual Plaintiffs either (i) are bound by the terms of the Brewer Memo or (ii) are estopped from claiming entitlement to any Firm distribution beyond that proposed in the Brewer Memo; or

    (c)   If there has not been a withdrawal or dissolution, then the individual Plaintiffs remain Members of and are liable to the Firm for damages or other recoveries under theories of (i) breach of fiduciary duty, (ii) conversion/misappropriation of Firm assets and (iii) unjust enrichment.  They seek a constructive or resulting trust and an equitable lien, and monetary recoveries.

III.

THE MOTIONS

[35]   Pursuant to the Revised CMO, Plaintiffs and Defendants filed their respective Motions.  The pivotal issues raised by the Motions are whether at the time of the Breakup, (a) Plaintiffs are deemed to have withdrawn from the Firm, either as a matter

of law or equity, or (b) a dissolution occurred or is mandated and (c) how should the Plaintiffs' distributive shares in the Firm be valued?

[36]     Notwithstanding the foregoing, by way of their Motion filed on August 15, 2008, Defendants also challenge the standing of any of Plaintiffs to bring this civil action, either in behalf of the Firm or in their individual names.  The issue of standing is jurisdictional and must be resolved before the substantive merits of the lawsuit may be addressed.  *Neuse River Foundation, Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113 (2002).

A.

Standing

[37]     Defendants contend that under the undisputed facts in this matter, the individual Plaintiffs do not have standing to bring this action, either in the name of the Firm itself, in the name of the Firm derivatively or individually.

[38]     Based upon the allegations of the Complaint, it is clear that Plaintiffs do not contend that this action is brought by the Firm.  Rather, they allege that the action is brought by them individually, and derivatively in behalf of the Firm pursuant to G.S. 57C-8-01.[12]  Accordingly, the court will focus on whether Plaintiffs have standing in this action, either individually or derivatively.

[39]     "Standing" refers to whether a party has a sufficient stake in an otherwise justiciable controversy so as properly to seek adjudication of the matter.  *Woodring v. Swieter*, 180 N.C. App. 362, 366 (2006).  It is a jurisdictional issue and does not generally concern the ultimate merits of a lawsuit.  *Town of Ayden v. Town of Winterville*, 143 N.C. App. 136, 140 (2001).  Standing is challenged properly by a motion to dismiss pursuant to Rules 12(b)(1) or 12(b)(6) for lack of subject matter jurisdiction.  *Fuller v. Easley*, 145 N.C. App. 391, 395 (2001).  The burden to show that standing exists is on the party asserting standing.  *Neuse River Foundation, Inc.,* 155 N.C. App. at 113 (2002).

[40]     Under Rule 17(a), a party lacks standing to sue if it is not a "real party in interest."  A real party in interest is one who "by substantive law has the legal right to

---

[12] Am. Compl., ¶ 8.

enforce the claim in question." *Whittaker v. Furniture Factory Outlet Shops*, 145 N.C. App. 169, 175 (2001) (citations omitted).

[41]     In support of their standing argument, Defendants rely primarily on *Crouse v. Mineo*, No. COA07-344, slip op. (N.C. App. filed Mar. 18, 2008), 658 S.E.2d 33 (2008). *Crouse* involved an action brought by a member-attorney of an LLC law firm against another member-attorney.  The dispute between the members arose from refusal of the Defendant to share with the Plaintiff portions of contingency fees realized from cases personally handled by the Defendant while he and the Plaintiff were members of the LLC.  In behalf of the LLC and himself, the Plaintiff alleged claims against the Defendant for breach of fiduciary duty, breach of contract, quantum meruit, unfair or deceptive trade practices and an accounting.  The Defendant contended that the Plaintiff did not have standing to prosecute the civil action either in behalf of the LLC or himself.  The trial court agreed and dismissed the Plaintiff's Complaint in its entirety,[13] and Plaintiff appealed.  After extensive analysis, the Court of Appeals reversed in part, holding that:

> (a)     Pursuant to G.S. 57C-3-20(b), managers of an LLC have equal rights and authority to participate in management, and management decisions require the approval of a majority of the managers.  Because the Defendant Mineo was the only other member-manager of the LLC, and he did not authorize or ratify the management decision to file the civil action, there was no majority approval; and the Plaintiff Crouse therefore lacked authority to cause the LLC to institute the action on its own behalf.

> (b)     However, pursuant to G.S. 57C-8-01(a) and G.S. 57C-8-01(b), a derivative action in behalf of an LLC is appropriate if (i) the plaintiff does not have authority to cause the LLC to sue in its own right, (ii) the plaintiff was a member of the LLC at the time the action was brought and at times material, and (iii) the member-plaintiff alleges with particularity the efforts made to obtain the desired action from those with authority over actions of the LLC.  Because (i) Plaintiff Crouse did not have management authority to cause the LLC to bring the suit, (ii)

---

[13] Although not relevant to the instant issues, counterclaims lodged by Defendant were not dismissed.

he was a member of the LLC at the time of filing,[14] (iii) his Complaint alleged sufficiently the efforts he made to obtain the desired but refused action from Defendant Mineo and (iv) notwithstanding that plaintiff did not specifically characterize the action as being derivative, he had standing to bring a derivative action on behalf of the LLC, and he had sufficiently alleged such a claim.

(c)      Plaintiff Crouse did not have individual standing to sue Defendant for unfair or deceptive trade practices[15] because any such claim would necessarily arise from the relationship between the individuals as members of the LLC, and therefore would exist, if at all, between the Defendants and the LLC.[16]

[42]      Plaintiffs here vigorously dispute Defendants' contentions as to the impact of *Crouse* on the instant case.  Rather, they contend it stands for the propositions that (a) the individual Plaintiffs have stated a derivative claim in behalf of the Firm and individual claims in their own behalves and (b) the filing by Crouse of Articles of Dissolution is analogous to the "[we're] out of here" declarations by Plaintiffs in the instant matter. Defendants argue that they each clearly reflect a desire no longer to associate in the practice of law with certain other members of the Firm, but that such statements by Plaintiffs should not be deemed a "withdrawal" from or termination of their interests in the Firm as that term is contemplated by the Act.

[43]      Based upon the material facts that exist in this matter without substantial controversy, and without regard to the contended merits of any Claims alleged by the Plaintiffs, the court CONCLUDES that:

---

[14] Plaintiff Crouse had filed Articles of Dissolution of the LLC in July 2003, prior to his filing of the civil action in December 2004.  Defendant contended that the provisions of G.S. 57C-3-02(3)(d) applied and that Crouse ceased to be a member of the LLC upon the filing of the Articles of Dissolution.  However, in a lengthy analysis, the court held that G.S. 57C-3-02(3)(d) was not applicable and that it does not operate to cause the disassociation of an LLC member who files a petition for dissolution of the LLC.  *Crouse,* 658 S.E.2d at 39.

[15] *Id.* at 42.  By analogy, the same reasoning would apply to a claim for breach of fiduciary duty, as alleged by Plaintiffs in the instant case.

[16] The Court did hold that Plaintiff could state an individual claim for *quantum meruit* as to work he personally performed with regard to the cases that generated the fees in dispute.  *Id.* at 42.  Plaintiffs in the instant case do not make such a claim and do not contend that they personally performed any services on the contingent fee cases that are the genesis of their controversy with Defendants.  By prior Order this court determined that Plaintiffs were not precluded from sharing in such fees by virtue of their personally not having worked on a particular contingent fee matter while they were Members of the Firm. (Order, May 8, 2007 ¶¶ 24-30.)

(a)     For purposes of the Motions, the court deems the individual Plaintiffs to have been Members[17] of the Firm at the time this action was filed.  At the time, the Plaintiffs did not constitute a majority of the Members of the Firm and they therefore did not have authority to cause the Firm to bring any Claims in its own behalf.  However, they did have standing pursuant to G.S. 57C-8-01(a) and G.S. 57C-8-01(b) to allege appropriate derivative Claims in behalf of the Firm.

(b)     Here, the Complaint alleges with sufficient particularity the actions and controversies of which Plaintiffs complain.  Although the Complaint does not specifically identify certain of the Claims as derivative, the facts alleged are sufficient to state such Claims and the respective demands made by the Plaintiffs of the Firm's Members who had appropriate authority.  The individual Plaintiffs therefore have standing derivatively to allege the following Claims ("Derivative Claims") in behalf of the Firm:  (i) For an Accounting to the Company (Claim One), (ii) Demand of Liquidating Distribution (Claim Three), (iii) Constructive Fraud/Breach of Fiduciary Duty (Claim Four) and (iv) Unfair and Deceptive Trade Practices (Claim Five).  These Derivative Claims, if viable, belong to the Firm and not the individual Plaintiffs.

(c)     Accordingly, to the extent said Derivative Claims are intended to be stated in behalf of the Firm, Plaintiffs have standing; and Defendants' Motion based on a lack of standing should be DENIED.  Conversely, to the extent such Derivative Claims are intended to be stated individually by the Plaintiffs, they lack standing; and Defendants' Motion should be GRANTED.

(d)     In light of the particular facts alleged in this matter, the individual Plaintiffs have personal standing to state a Claim for Accounting to the Plaintiffs (Claim Two); and as to that Claim, the Defendants' Motion should be DENIED.

---

[17] Defendants' contentions as to whether Plaintiffs' actions constituted a withdrawal from the Firm, as defined by the Act or pursuant to principles of equity, are discussed *infra,* ¶¶ 62-76.  Notwithstanding the court's dispositive ruling *infra*, which is based upon principles of equity, the court deems Plaintiffs to have Member status in the firm for purposes of derivative standing.

B.

The Substantive Motions – Withdrawal or Dissolution

[44]   The court having concluded that the individual Plaintiffs have standing to assert derivatively and personally certain of the Claims in this matter, it then must consider the substantive Motions.  In this regard, the issue presented by the Motions is: Do the undisputed Breakup Facts establish as a matter of law either that (a) the individual Plaintiffs are deemed to have withdrawn from the Firm at the time of the Breakup, pursuant to G.S. 57C-5-06, or principles of equity; or (b) a dissolution occurred or should be declared pursuant to G.S. 57C-6-01(1) and 57C-6-02(2)?

[45]   The pragmatic substantive issue underlying this dispute is whether, and to what extent, the individual Plaintiffs are entitled to share in legal fees that ultimately may be realized from the Contingent Fee Cases being handled by Defendants both before and after the Breakup but that are resolved after the Breakup.[18]

[46]   Distribution upon Withdrawal.  If, as contended by Defendants, the individual Plaintiffs' act of leaving the Firm at the time of the Breakup constituted a withdrawal from the Firm either (a) pursuant to G.S. 57C-1-03(14), G.S. 57C-3-02(1) and G.S. 57C-5-06 or (b) as a matter of equity, their post-Breakup rights to share in Firm distributions would be governed by G.S. 57C-05-07; and their final distributions from the Firm would be limited to the fair value of each Plaintiff's interest in the Firm as of the date of withdrawal.  In such case, the Defendants contend that Plaintiffs would not share in any fees subsequently realized from the Contingent Fee Cases because the value of such cases at the time of the Breakup was so uncertain and speculative -- and therefore impossible to quantify -- that they would have no distributive value.[19]

[47]   Distribution upon Dissolution.  However, as Plaintiffs contend, if dissolution occurred while they were Members, their distributive rights would be governed by G.S. 57C-6-04(b) and G.S. 57C-6-05(3).  As a result, unless otherwise agreed, the Firm, as

---

[18] Presumably, this also would include sharing the burden of sometimes-substantial expenses incurred with regard to any such cases that for whatever reason do not produce a legal fee.  There is more to this issue than just the Defendant-retained Contingent Fee Cases, in that since the individual Plaintiffs also retained engagements involving contingent fees, and the sharing of profits or losses from those cases likewise could be implicated by the outcome of this matter.

[19] The merits of such a contention are not now before the court.  However, if a withdrawal is ultimately found to have occurred at the time of the Breakup, the valuation of the Contingent Fee Cases as of that date would appear to be more problematic for Plaintiffs.

an LLC, would continue in existence while its managers, or others charged with winding up its affairs, would have a statutory duty to (a) obtain "[a]s promptly as reasonably possible . . . the fair market value for the [LLC's] assets"[20] and (b) distribute the net balance of those assets to the LLC's Members, and others. G.S. 57C-6-04(b) and G.S. 57C-6-05(3). Under this scenario, Plaintiffs contend that they would remain Members until the "winding up" of the Firm has been completed, and that they would share as Firm Members in any distributions of profits realized from Contingent Fee Cases at a reasonable time after their ultimate resolution.[21]

[48]    Given the material facts that exist in this matter without substantial controversy, the Defendants contend either that (a) the Plaintiffs' words and actions, as reflected in the Breakup Facts, as a matter of law constituted a *de facto* withdrawal by them from the Firm at the time of the Breakup; (b) through a liberal construction of the Act, there is sufficient evidence before the court to establish that Plaintiffs withdrew from the Firm pursuant to a written operating agreement as required by G.S. 57C-5-06; (c) because of their affirmative acts of withdrawal, the individual Plaintiffs should be estopped under principles of equity from denying that they withdrew from the Firm; (d) the Firm did not and has not dissolved under G.S. 57C-6-01 or otherwise, following the Plaintiffs' withdrawal; or (e) upon Plaintiffs' withdrawal, only the Defendants could elect to dissolve the firm and at times material to this litigation no such dissolution occurred.

[49]    On the other hand, the Plaintiffs contend that as a matter of law (a) the individual Plaintiffs did not "withdraw" from the Firm as that term is defined in G.S. 57C-5-06, and that there was no other lawful way for them to have withdrawn; and (b) that the Breakup constituted a "de facto" dissolution on or about July 1, 2005. In the alternative, Plaintiffs contend that application of North Carolina partnership law to the instant facts would reach a similar result with regard to whether a withdrawal or a dissolution is deemed to have occurred.

---

[20] Neither the Act nor the Firm's Articles define "assets." *But see*, *supra*, fn. 9.
[21] The requirement that the fair market value of an LLC asset be obtained "as promptly as reasonably possible," and the mechanics of how that is achieved, must be viewed relative to the business the LLC conducts and the types of assets it holds. The court can find no reason why law firm engagements, such as the Contingent Fee Cases, cannot be liquidated in a manner consistent with these statutory requirements.

[50]     De Facto Withdrawal.  The Act provides specific instances in which one's membership in an LLC may cease, by one or more "events of withdrawal."[22]  The one instance at issue in this case is when a member voluntarily withdraws,[23] as provided by G.S. 57C-5-06 (the "Voluntary Withdrawal Provision").  The Voluntary Withdrawal Provision states that "[a] member may withdraw *only* at the time or upon the happening of the events specified in the articles of organization or a *written* operating agreement,"[24] which must be binding upon all Members (emphasis added).[25]

[51]     The Defendants here contend that the individual Plaintiffs voluntarily and *de facto* withdrew and left the Firm at the time of the Breakup, and that -- the Voluntary Withdrawal Provision notwithstanding -- their actions of withdrawal are binding upon them.  The established Breakup Facts upon which Defendants rely are (a) the oral declarations and actions by Adams and Boughman in announcing at the meeting on June 14, 2005, that they were leaving the firm; (b) Burge's subsequent announcement on June 25, 2005, that she also was leaving the Firm to join Adams and Boughman; (c) the individual Plaintiffs' affirmative actions in seeking to be relieved of any existing or future Firm debts or liabilities; (d) their physically leaving the Firm's practice and formally setting up a separate law practice; (e) the specific reference to "withdrawal" by Plaintiffs in the Brewer Memo;[26] (f) the references to the Plaintiffs' "withdrawal" and "termination of their employment with the Firm" in post-Breakup draft letters[27] to clients prepared by Plaintiff Burge; (g) the January 6, 2006 letter[28] from Plaintiffs' counsel to Defendant Brewer, which refers to Plaintiffs' "withdrawal" from the Firm and does not state any contentions with regard to dissolution; (h) the various Members' actions of reliance after the Breakup in moving forward with their respective law practices as though a withdrawal had occurred; and (i) the delay of almost one year after the Breakup before Plaintiffs took a position that they in fact had not withdrawn from the Firm, but rather that a dissolution was in order.

---

[22] G.S. 57C-3-02.
[23] G.S. 57C-3-02(1).
[24] G.S. 57C-5-06.
[25] G.S. 57C-1-03(16).
[26] Am. Compl., Ex. 1.
[27] Defs.' Exs. I and J.
[28] Am. Compl., Ex. 2.

[52]     The Defendants argue that the definition of withdrawal should be interpreted liberally and broadly, and by the plain and ordinary meaning of the word.[29]  They contend that -- although the Firm's Articles do not deal with withdrawal and the Firm had no formal written document designated as an operating agreement -- plain logic dictates the conclusion that in light of the Plaintiffs' actions as reflected in the undisputed facts, the Plaintiffs de facto "withdrew" from the Firm.  They say that all Members relied upon the Plaintiffs' unilateral and voluntary acts of withdrawal, and that Plaintiffs therefore are bound by their acts of withdrawal.  Defendants point out that a result to the contrary would give each member of an LLC the power unfairly to force a potentially disruptive dissolution unilaterally and at his or her whim, and that this would give that member inappropriately significant leverage to extract concessions from other members who want the LLC to continue.[30] In this regard, Defendants forecast a bleak scenario in which a law firm member could refuse to participate in the LLC without formally withdrawing until the other members agree to dissolution on terms inequitably weighted in favor of the recalcitrant member.  They say that in such a situation, the other members would be faced with the distasteful choices of either (a) dissolution, (b) a law suit with undetermined outcome possibilities or (c) allowing the departed member to continue sharing in the firm's profits.

[53]     The individual Plaintiffs argue to the contrary, saying the issue is simple: If the Articles do not define events of withdrawal, and there is no written operating agreement in place that defines events of withdrawal, a Member cannot withdraw; and dissolution is the only option.  Defendants counter that such a conclusion is tantamount to a determination that it is impossible for a member to withdraw from an LLC that does not address "withdrawal" in its articles of organization or a formal written operating agreement.[31]

---

[29] Defendants cite a variety of sources as to the ordinary definition of "withdraw."  *E.g.*, "to remove oneself from participation or activity in something," Webster's New International Dictionary 2626  (3d ed. 1961); "the art of leaving," Roget's Thesaurus 1058 (2d ed. 1980).

[30] Such a result appears to have been a problem in other states, which unlike North Carolina, provide that the leaving of any member forces a dissolution of an LLC.  Larry E. Ribstein, *The Emergence of the Limited Liability Company*, 51 Bus. Law. 1, 30 (1995).

[31] As previously observed by the court in its May 8, 2007 Order, in the absence of compliance with the clear statutory requirements of the Voluntary Withdrawal Provision, and depending on the facts of a particular matter, it is true that an inconvenient impasse may occur.  However, such a situation clearly and easily could be avoided by prior agreement, as encouraged by the Act.  Certainly, it would be far less

[54]     There appears to be no reported case authority on this issue.  At first blush, Defendants' "plain logic" argument is inviting in that it speaks of fairness and common sense.  However, the Voluntary Withdrawal Provision is clear and unambiguous in its provisions; and the court is concerned that were Defendants' argument to prevail, the result could be consequences not intended by or consistent with the purposes and intent of the Act.  By way of example, if the court were to embrace Defendants' *de facto* withdrawal argument and conclude that a member of an LLC law firm unilaterally can "withdraw" by walking away from the firm without compliance with the Voluntary Withdrawal Provision, consider a scenario that reverses the situation of the litigants in the instant case.  If, at the time of a *de facto* withdrawal, the withdrawing member retained an unresolved and potentially lucrative contingent fee matter, *quaere*, would he be in a position to argue that (a) the firm's assets must be valued as of the date of his withdrawal, (b) the value at that time of the contingent fee matter he retained  would be speculative and therefore (c) his former law firm would recognize little, if any, [32] value from the case, even though it later results in a substantial fee?  The court cannot conclude that either the spirit or substance of the Act is intended to allow such a result in the absence of prior agreement by the members in compliance with the Voluntary Withdrawal Provision.

[55]     Therefore, except as otherwise discussed in this Order, the court CONCLUDES that the substantive requirements of the Act do not allow a unilateral *de facto* withdrawal by a member, absent compliance with the Voluntary Withdrawal Provision; and therefore, the individual Plaintiffs in the instant matter did not *de facto* withdraw from the Firm at the time of the Breakup.

[56]     <u>Withdrawal by Written Operating Agreement</u>.  As an alternative to a *de facto* withdrawal by the individual Plaintiffs, Defendants contend that -- when considered

---

difficult for the members to reach agreement at the time of formation of an LLC, or at some other time when active disagreement does not exist.  Waiting until the flames of dispute and disagreement are burning usually is too late.

[32] A secondary issue would arise if one or more members of the law firm in fact had done work on the contingent fee engagement prior to the member's *de facto* withdrawal.  Would the law firm, or those members who worked on the case, be entitled to share on a *quantum meruit* basis in any contingent fee ultimately realized?  *See generally Pritchett & Burch, PLLC v. Boyd*, 169 N.C. App. 118 (2005); *Environmental Landscape Design v. Shields*, 75 N.C. App. 304 (1985).  *See also*, discussion, Order, May 8, 2007 ¶¶ 25-28.

collectively and given the liberal and common sense construction Defendants contend was intended by the Act -- the course of conduct, various writings and e-mail by and between the Plaintiffs, their counsel and Defendants, as reflected in the Breakup Facts, constituted a binding written operating agreement on the discrete question of whether Plaintiffs withdrew from the Firm at the time of the Breakup. Plaintiffs vigorously dispute such a construction of either the Breakup Facts or the provisions and intent of the Act. After due consideration, the court is not persuaded by Defendants' argument on this point.

[57] G.S. 57C-1-03(16) defines "Operating Agreement" as

> any agreement, *written or oral*, of the members with respect to the affairs of a limited liability company and the conduct of its business that is binding on all the members . . . (emphasis added).

G.S. 57C-5-06 further requires that an LLC Member may withdraw

> *only* at the time or upon the happening of the events specified in the articles of organization or a *written* operating agreement (emphasis added).

[58] In Robinson on North Carolina Corporation Law, the author observes that an operating agreement is "not necessarily a single document, or even a document at all." Russell M. Robinson, Robinson on North Carolina Corporation Law § 34.02(2) (7th ed. 2008). However, he goes on to point out that an operating agreement must be binding upon and signed by all members if it is in writing (as required for withdrawal purposes by G.S. 57C-5-06); and he further discusses the various subjects and provisions most likely to be included in an operating agreement.[33] It is clear the author has concluded that the Act anticipates that an "operating agreement," whether written or oral, in substance would be relatively comprehensive in dealing with fundamental LLC operating issues.

---

[33] The author concludes that while an LLC is a creature of contract between the members, and a wide range of business issues are logical candidates for inclusion in an operating agreement, most will include provisions relating to such matters as: the identities of initial members; capital contributions; obligations relative to possible later capital calls; the respective equity of each member; the respective members' shares of profits and losses; distributions of cash and other assets; the identity of managers and their powers and duties; indemnity agreements between managers and members; buy and sell protocols among members; tax treatments of various LLC transactions and operations; and among other things, as discussed in this Order, events and conditions of withdrawal by a member.

[59]     The initial affirmative declarations of withdrawal from the Firm were by Plaintiffs Adams and Boughman, and were made orally at the June 14, 2005 meeting. There is no evidence that Plaintiff Burge physically left the meeting or made similar declarations of withdrawal that day, although on or about June 25, 2005, she did orally inform Defendant Mitchell that she, too, was "leaving" the Firm to join Adams and Boughman in law practice.  The first "written"[34] indication of withdrawal was by Plaintiff Adams' e-mail message on June 14, 2005, to Brewer and other members of the Firm, in which he referred to his "leaving the firm."[35] There is no evidence that a similar e-mail was sent by the other Plaintiffs. The written correspondence between Brewer and Plaintiffs' counsel, while referring to the Breakup as a "withdrawal," dealt in substance with valuing the Contingent Fee Cases; and, whether considered individually or collectively, do not rise to the level of a "written operating agreement" on the issue of withdrawal as contemplated by the Act.  None of the various other writings relied upon by Defendants as part of the collection of evidence contended to constitute a written operating agreement are signed by all Plaintiffs, and none specifically reference an agreement with regard to withdrawal.

[60]     As was the case with Defendants' *de facto* withdrawal argument, their contention on this issue is attractive from a common sense perspective -- especially given the declarations, statements and various actions by the Members surrounding the time of the Breakup.  It well may be that in a given case, multiple documents viewed collectively could constitute a written operating agreement as contemplated by the Act. This, however, is not that case.

[61]     While the forecast undisputed facts here are relevant and material on the issue of purpose and intent surrounding the Breakup, they are too fragmented and disparate to support the existence of a written operating agreement.  Therefore, the court CONCLUDES that at or about the time of the Breakup there did not exist a written operating agreement on the issue of withdrawal by the Plaintiffs from the Firm.[36]

---

[34] For purposes of ruling on the Motions, the court does not need to determine whether the e-mail constitutes a "writing."

[35] Defs' Ex. H.

[36] In its May 8, 2007 Order at fn. 8, this court concluded that "at best" the Brewer Memo and the January 6, 2006 letter to Brewer from Plaintiffs' counsel presented a question of fact as to whether they constituted a written operating agreement.  That observation was in the context of Defendants' Motion to

[62]     Estoppel.  As a second alternative to their contention that there was a *de facto* withdrawal by the individual Plaintiffs, Defendants argue that Plaintiffs should be estopped by principles of equity from denying that the Breakup constituted a withdrawal by them from the Firm.  They point out that G.S. 57C-10-03(b) provides that "the law of estoppel shall apply" to LLC organizations, and that G.S. 57C-10-05 provides that in "any cases not provided for in . . . [Chapter 57C], the rules of law and equity shall govern."

[63]     The particular facts of this matter appear to present a case of first impression on this issue.  After due consideration, the court concludes that the Breakup Facts present a situation not consistent with the spirit or letter of the Act, and therefore not provided for in the Act.[37]  Accordingly, pursuant to G.S. 57C-10-03(b) and 57C-10-05, the rules of both law and equity govern; and if appropriate under the facts at hand, the law of estoppel may apply.

[64]     Estoppel is a matter of equity, and when the facts are undisputed it becomes a question of law, properly to be decided by the court. *Hawkins v. M&J Finance Corp.*, 238 N.C. 174, 185 (1953).

---

Dismiss pursuant to Rules 12(b)(1) and 12(b)(6).  Having now been presented with the undisputed facts as reflected in this Opinion and Order, the court concludes that there exists no genuine issue of material fact on the issue.

[37] In support of their contentions, the Plaintiffs also argue in the alternative that if the court concludes that the Breakup presents a situation not provided for in the Act, then the court should look for guidance to partnership law under the North Carolina Uniform Partnership Act ("UPA").  More specifically, they point to G.S. 59-59, which provides that a partnership is dissolved upon one of the partners "ceasing to be associated in the carrying on" of the partnership's business.  Plaintiffs concede that when read together, G.S. 55B-3 and G.S. 57C-2-01(c) mandate that the Act, and not the UPA, applies to PLLC entities. However, they argue that when presented by facts such as in the instant case, the court may analogize a law firm to an "incorporated partnership," such as a closely held corporation, and that the court can properly apply partnership law.  *Meiselman v. Meiselman*, 309 N.C. 279 (1983); *Stancil v. Stancil*, 94 N.C. App. 319 (1989) (overruled on other grounds) at 325 N.C. 766 (1990).  On this theory, Plaintiffs would have the court look to the UPA and analogize provisions of G.S. 59-59 to their "leaving" the Firm, and therefore working a dissolution, even if the court concluded they had "withdrawn."  As a result, they seek an alternative declaration that their leaving the Firm caused the Firm to be dissolved, as if it were a partnership.  It is true that in a fashion somewhat parallel with the UPA, in a former version of the Act, G.S. 57C-6-01 provided that the withdrawal or cessation of membership in an LLC by a single member resulted in dissolution of the LLC, unless the remaining members voted to continue the LLC's existence. However, the Act was amended in 1999, and as part of the amendment, the automatic dissolution provision was eliminated. *See* 1999 N.C. Sess. Laws 189 § 5.1.  G.S. 57C-6-01 now provides that an individual member's withdrawal from the LLC does not trigger a dissolution and winding down unless the withdrawal is by the last remaining member.  Consequently, Plaintiffs' contention that the court should apply the UPA withdrawal and dissolution concepts to the instant LLC matter is not persuasive, and the court concludes that the UPA is not applicable here.

[65]     Black's Law Dictionary observes that estoppel is "kaleidoscopic" in its varieties.  Among other ways, estoppel can arise by conduct, deed or misrepresentation; and it is viewed as "flexible" in its application.  It is a principle of equity that sometimes is described as "a bar that prevents one from asserting a claim or right that contradicts what one has said or done before . . . "  Black's Law Dictionary 589 (8th ed. 1999).  Estoppel arises when one party has been induced by the acts of another to believe that certain facts exist, and there is reliance and action on that belief to the detriment of the actor.  *Godley v. Pitt*, 306 N.C. 357, 360 (1982); *Jordan v. Crew*, 125 N.C. App. 712 (1997).

[66]     The North Carolina courts have recognized that the circumstances under which the equitable doctrine of estoppel may be imposed are not reducible to a particular formulation of principles.  *Price v. Price*, 169 N.C. App. 187, 190 (2005) (in the context of judicial estoppel).  The application of estoppel may vary based on the facts of each case.  *Miller v. Talton*, 112 N.C. App. 484, 488 (1993).  Further, neither intent to deceive, bad faith nor fraud are necessary before estoppel may apply.  *Hamilton v. Hamilton*, 296 N.C. 574, 576 (1978).

[67]     A party asserting estoppel has the burden of establishing that:

   (a)     The conduct sought to be estopped amounts to a false representation of material facts, or is reasonably calculated to give the impression that the facts are other than those the party undertakes to assert afterwards;

   (b)     There is an expectation by the party making the representation or asserting the facts that the other party will act on the representation;

   (c)     There exists actual or constructive knowledge of the real facts by the party sought to be estopped, and a lack of knowledge of the truth as to the facts on the part of the party asserting estoppel; and

   (d)     The party asserting estoppel relies on the representation and takes action to its detriment.

   Strong's North Carolina Index 4th 603-04 (So Alexandria Chun ed., West Group 2001) (*see also* cases cited therein in fn. 4).

[68]     Defendants contend that for purposes of this matter, the Plaintiffs should be estopped by their conduct, as reflected in the Breakup Facts, from denying that they

withdrew from the Firm at that time. In support of their position, Defendants point out that (a) after the June 14, 2005 meeting and the weeks that followed, the individual Plaintiffs made affirmative oral and written representations that they intended to withdraw from the Firm; (b) all Members of the Firm, both Plaintiffs and Defendants, dealt with the Breakup as constituting a withdrawal by the Plaintiffs, and took various material actions consistent with a withdrawal; (c) shortly after the Breakup, the Plaintiffs physically left the Firm's practice and set up their own separate law firm; (d) the Defendants relied upon Plaintiffs' representations of withdrawal and took detrimental action as a result;[38] and (e) it was not until approximately one year after the Breakup,[39] when the parties had been unable to agree on whether and how the Contingent Fee Cases could be valued for distribution purposes, that the Plaintiffs took a position that they had not withdrawn from the Firm after all, but rather that a dissolution had occurred or should be declared. During that one year's time, the individual Plaintiffs practiced together in their new firm and the Defendants did the same with the Firm, and both the Plaintiffs and the Defendants took affirmative and substantive actions still consistent with withdrawal by the Plaintiffs. Defendants argue that, taken together, all of the foregoing Breakup Facts operate to estop the Plaintiffs from denying that they withdrew from the Firm as of the time of the Breakup.

[69] It is clear from the undisputed facts that at the time of the Breakup in June 2005, any material disputes between the Members were focused on the Contingent Fee Cases and whether they then held any ascertainable value. There appears to have been no material change in this focus until almost a year later, when in June 2006, Plaintiffs' counsel wrote Brewer and took the position that dissolution had occurred. Nothing in the forecast of evidence indicates that prior to June 2006, either side to this action raised an issue as to the legal and practical impact of the Act upon the distributive shares of the respective Members presented by the alternatives of (a) withdrawal by the Plaintiffs or (b) dissolution of the Firm. In fact, it appears that all Members who were deposed testified that none of them appreciated the distinctions between "withdrawal" and "dissolution" under the Act.

---

[38] For example, they took affirmative steps with third parties to relieve the individual Plaintiffs of personal liability on present and future Firm debts and obligations.

[39] *See* June 21, 2006 letter from Plaintiffs' counsel to Brewer. Am. Compl., Ex. 2.

[70]     Plaintiffs argue that since they apparently did not appreciate or examine the distinction between withdrawal and dissolution prior to the Breakup, they cannot have formed an intent to "withdraw" as defined by the Act.[40]  However, application of the equitable doctrine of estoppel does not require that there have been specific knowledge by Plaintiffs that their representations at the time of the Breakup that they were "withdrawing" from the Firm were false.  The wrong lies in the inconsistent position subsequently taken by the Plaintiffs, rather than in the original conduct.  *Hamilton v. Hamilton*, 296 N.C. 574, 576 (1978).  The court concludes that when they unilaterally chose to leave the Firm, and characterized their leaving as a "withdrawal," the Plaintiffs were charged with knowledge of the consequences of their actions; and Defendants were entitled to rely and act upon those actions.

[71]     Plaintiffs further argue that their silence of almost one year before taking the position that at the Breakup did not constitute their withdrawal from the Firm, but rather effected its dissolution, cannot be a basis for estoppel.  In support, Plaintiffs cite *Neal v. Craig Brown, Inc.*, 86 N.C. App. 157 (1987), *quoting Barnhardt v. Morrison*, 178 N.C. 563 (1919), for the proposition that estoppel by silence must occur under circumstances in which there existed an opportunity and apparent or real duty to speak.  However, the undisputed facts here establish that the Plaintiffs, being charged with knowledge of the consequences of a withdrawal by them from the Firm, as opposed to a dissolution, remained silent on the pivotal issue for approximately one year.  Plaintiffs knew that the Defendants were taking actions after the Breakup as though it constituted a withdrawal by the Plaintiffs; and during that time, they had both opportunity and a duty to speak.

[72]     Plaintiffs further contend that Defendants were not induced either by Plaintiffs' silence or their actions to believe there had been a withdrawal; and that even if they were, the Defendants did not rely on any such representations.  They also argue that their formation of a new law firm was not relevant to whether they withdrew from the Firm.  However, the court is forced to conclude that these Breakup Facts simply do not support Plaintiffs' contentions.

---

[40] Pls.' Resp. Defs.' Mot. Summ. J., p. 3.

[73]     Plaintiffs also point out that the Brewer Memo[41] speaks of a "winding up" of the Firm's affairs and "dissolution of [the] partnership," and they contend that such language clearly reflects an intent to dissolve the Firm.  However, the Brewer Memo is directed to "all remaining and withdrawing partners" of the Firm, and speaks of a "winding up" of the operations of the Firm by the "remaining members . . . ."  It is true, as Plaintiffs contend, that the Brewer Memo in some ways is equivocal, in that it also states that the "*remaining members* of the firm are effectuating a winding up of the operation of the law firm *as it was previously constituted*. . ." (emphasis added).  However, when read in context, it is clear that the Brewer Memo and all other evidence of record prior to June 2006 supports Defendants' contention that the Breakup was treated and acted upon by all concerned as a "withdrawal" by the individual Plaintiffs.  The only material issue in dispute was how, and whether, the Contingent Fee Cases could be valued at the time of the Breakup.

[74]     Plaintiffs argue that a declaration that they are deemed to have withdrawn from the Firm at the time of the Breakup would be unfair in light of the circumstances of this case.  They say that such a ruling would limit their distributive rights to the fair value of Firm assets as of the day of withdrawal and would be unfair, given the potential difficulty in measuring the value of the Contingent Fee Cases as of that time.  However, the other side of that argument is that at the June 14, 2005 Firm meeting, the Plaintiffs Adams and Boughman  unilaterally and precipitously voiced their intent to leave the Firm, both physically and professionally, and to set up their own independent law practice.  Plaintiff Burge ratified their actions by leaving two weeks later.  Plaintiff Adams declined Defendant Mitchell's request that he not leave the meeting, dialogue which clearly was heard by Plaintiffs Boughman and Burge; and Boughman himself also then left the meeting.  There is no forecast of evidence to the effect that there ever were any material discussions as to the distinction of whether the Breakup constituted a "withdrawal" by Plaintiffs or a "dissolution" of the Firm.  However, it is clear that all Members acted as though it constituted a withdrawal by the Plaintiffs.  The fact that the unilateral decision by Plaintiffs to leave the Firm subsequently turned out potentially to

---

[41] Am. Compl., Ex. 1.

be to their economic disadvantage is regrettable, but not relevant to whether they are deemed to have withdrawn.[42]

[75]     Here, the Breakup Facts meet the requirements for the application of the equitable doctrine of estoppel, in that:

(a)     The factual representations made by the individual Plaintiffs at times material to the Breakup were substantially and substantively different from the facts that the Plaintiffs attempted to assert almost one year later.

(b)     Plaintiffs anticipated that the other Members would rely and act upon Plaintiffs' representations and actions of withdrawal.  Indeed, Plaintiffs took aggressive and affirmative steps to ensure that their leaving of the Firm was effective at the time.

(c)     At the time of the Breakup, the Plaintiffs were charged with notice, either actual or constructive, of the consequences of their words and actions of "withdrawal."

(d)     The Defendants relied to their detriment on the Plaintiffs' representations of withdrawal.

[76]     Consequently, after due consideration of the undisputed facts in this matter, the court is forced to CONCLUDE as a matter of equity, that the various unilateral statements and actions by the individual Plaintiffs, and the resulting actions by the Defendants, constituted a withdrawal from the Firm by the individual Plaintiffs by way of estoppel, as of June 30, 2005.

[77]     The court having concluded that the Plaintiffs are deemed to have withdrawn from the Firm, further examination of the Plaintiffs' contentions with regard to dissolution is not necessary.

---

[42] The court shares the concern voiced by Defendants that a logical extension of Plaintiffs' argument is that a member of an LLC law firm, for whatever reason, could simply walk out of the firm and start a new firm with its new engagements and profits, yet have his unilateral act of leaving force a dissolution of the prior firm without his member partners having any voice in whether the member's exit was to be treated as a withdrawal from the LLC or a dissolution.  Such a scenario becomes more troubling if there is the added possibility that immediately after leaving, and by preexisting design, the leaving member would acquire new contingency or other lucrative engagements from which he expects to realize material profits that would not be shared with his prior LLC members -- while at the same time potentially contending that his leaving caused a dissolution of the prior firm in which he would share ultimate profit distributions.

IV.

CONCLUSION

[78]     NOW THEREFORE, based upon the foregoing, it is ORDERED that:

(a)     The individual Plaintiffs have standing to allege the following Derivative Claims in behalf of the Firm: (i) For an Accounting to the Company (Claim One), (ii) Demand of Liquidating Distribution (Claim Three), (iii) Constructive Fraud/Breach of Fiduciary Duty (Claim Four) and (iv) Unfair and Deceptive Trade Practices (Claim Five).  Accordingly, to the extent said Derivative Claims are intended to be stated derivatively in behalf of the Firm, Defendants' Motion for Summary Judgment based on the issue of standing is DENIED.

(b)     The individual Plaintiffs have personal standing to state a Claim for Accounting to the Plaintiffs (Claim Two).  Accordingly, as to said Claim, the Defendants' Motion for Summary Judgment based on the issue of standing is DENIED.

(c)     To the extent the Defendants' First Claim for Relief, stated as a Counterclaim in the Answer, seeks a declaration that the individual Plaintiffs withdrew from the Firm pursuant to G.S. 57C-5-06, there exist no genuine issues of material fact; and Plaintiffs are entitled to judgment in their favor on such question.  Therefore, on the discrete issue of whether the individual Plaintiffs withdrew from the Firm pursuant to G.S. 57C-5-06, the Plaintiffs' Motion for Summary Judgment in their favor is GRANTED; and as to said discrete issue the Defendants' First Claim for Relief is DISMISSED.  As to any other relief sought by the Defendants' First Claim for Relief, there exist genuine issues of material fact; and as to such relief summary judgment is DENIED.

(d)     To the extent the Defendants' Second Claim for Relief, stated as a Counterclaim in the Answer, seeks a declaration that under principles of estoppel the individual Plaintiffs are deemed to have withdrawn from the Firm as of June 30, 2005, there exist no genuine issues of material fact; and Defendants are entitled to judgment in their favor on such question.  Therefore, on the discrete issue of whether the individual Plaintiffs are estopped from denying that they withdrew from the Firm, the Defendants' Motion for Partial Summary Judgment is

GRANTED; and it hereby is DECLARED that the individual Plaintiffs are ESTOPPED from denying that they withdrew from the Firm as of June 30, 2005. As to any other relief sought by the Defendants' Second Claim for Relief, there exist genuine issues of material fact; and as to such relief the Defendants' Motion for Partial Summary Judgment is DENIED.

(e)     The Defendants' Motion for Summary Judgment in their favor with regard to the Third, Fourth, Fifth, Sixth, Ninth and Tenth Claims for Relief, stated as Counterclaims in the Answer, is MOOTED by the conclusions contained in this Order; and no ruling thereon is necessary.

(f)     Plaintiffs' Claims One, Three, Four and Five seek adjudication to the effect that dissolution of the Firm occurred as of July 1, 2005; and each seeks various types of relief as to affairs of the Firm after that date.  In light of the court's ruling that the individual Plaintiffs are estopped from denying that they withdrew from the Firm as of June 30, 2005, there exist no genuine issues of material fact with regard to Plaintiffs' Claims One, Three, Four and Five; and Defendants are entitled to judgment in their favor.  Therefore, Defendants Motion for Summary Judgment as to said Claims is GRANTED; and Plaintiffs' Claims One, Three, Four and Five hereby are DISMISSED.

(g)     Plaintiffs' Claim Two seeks an accounting from the Defendants relative to the financial affairs of the Firm after July 1, 2005.  However, in consideration of the court's ruling that the individual Plaintiffs are deemed to have withdrawn from the Firm as of June 30, 2005, the court concludes that Claim Two is sufficiently broad as to present in this civil action the issue of the fair value of the individual Plaintiffs' respective distributable interests in the Firm as of June 30, 2005. Further, as to Claim Two, the court concludes there exist one or more genuine issues of material fact.  Therefore, Defendants' Motion for Summary Judgment as to Claim Two is DENIED.

(h)     Defendants' Seventh and Eighth Claims for Relief, stated as Counterclaims in the Answer, have not been the subject of any of the dispositive

motions lodged by any party to this action under Rule 56; and therefore no ruling as to said Seventh and Eighth Claims is necessary or intended by this Order.[43]

     (i)     Plaintiffs' Motion for Summary Judgment in their favor is DENIED.

[79] The court will hold a case management conference with all counsel in this matter on April 16, 2009, at 2:00 p.m., in the North Carolina Business Court, 227 Fayetteville Street, Raleigh, North Carolina. At that time, the court will consider procedural and scheduling issues with regard to the remaining Claims in this action.

V.

## FINAL JUDGMENT OF FEWER THAN ALL CLAIMS

[80] This Order disposes of fewer than all of the Claims and Counterclaims alleged in this action. Pursuant to authority of Rule 54(b), the court determines that there is no just reason for delay in entering final judgment as to the Claims and Counterclaims resolved as reflected herein.

[81] Therefore, except for future determination of the Plaintiffs' Claim Two and Defendants' First, Second, Seventh and Eighth Claims stated by Counterclaim, the rulings reflected in this Order are deemed to constitute a final judgment as to all Claims and Counterclaims raised in this civil action.

     SO ORDERED, this the 31st day of March, 2009.

---

[43]On its face, Plaintiffs' Motion seeks judgment in Plaintiffs' favor, among other things, as to all of Defendants' Counterclaims, "other than Numbers 7 and 8." Pls.' Mot., p. 1. However, in their brief, Plaintiffs' contend that "Defendants' third through tenth counterclaims are without merit and they should be resolved in Plaintiffs' favor." Br. Supp. Pls.' Summ. J. Mot., p. 18. Notwithstanding such language, no arguments as to Defendants' Seventh and Eighth Counterclaims were presented by either side.